IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Hartford Underwriters Insurance Co., | ) | |
| | ) | |
| Plaintiff, | ) | No. 16 C 2381 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| Worldwide Transportation Shipping Co., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

Defendant, Worldwide Transportation and Shipping Company ("Worldwide"), an Iowa trucking company, applied for Iowa workers' compensation coverage and obtained a policy with Plaintiff, Hartford Underwriters Insurance Company ("Hartford"), a company exclusively authorized to provide insurance in Iowa. Worldwide employee and Illinois-resident Mr. Finnegan was injured while at work in Illinois. He subsequently died from the injury and his estate, Defendant Finnegan Estate, filed a claim for workers' compensation in Illinois. Worldwide sought to cover the Finnegan claim under the Hartford policy. On February 18, 2016, Hartford filed a declaratory judgment action against Worldwide and the Finnegan Estate, (Dkt. 1 at 1), pursuant to 28 U.S.C. §§ 2201 and 2202, seeking a declaration that it owes no duty to defend or indemnify Worldwide or to pay insurance benefits to the Finnegan Estate. *Id*. at 10. Hartford now moves for summary judgment on its declaratory judgment action as well as on Worldwide's affirmative defenses of estoppel and waiver. *Id.* For the following reasons, Hartford's Motion [53] is granted and Hartford has no duty to defend, indemnify, or pay any insurance benefits on the Finnegan claim.

# BACKGROUND

On September 17, 2014, Worldwide employee, John Finnegan, was killed in a workplace accident in McCook, Illinois. (Dkt. 35–1 at 41; Dkt. 36 at 2.) Mr. Finnegan and his wife, Noreen, resided in Illinois at the time of his death. (Dkt. 54 at ¶ 3.) Mrs. Finnegan, acting on behalf of her husband's estate (the Finnegan Estate), filed a claim for benefits with the Illinois Worker's Compensation Commission (IWCC) on August 5, 2015. (Id. at 38–39.)

*The Hartford Policy*

On June 20, 2014, third-party defendant Goettsch-Kay LLC, d/b/a Sheridan & Associates Agency ("Sheridan"), a licensed insurance producer acting on behalf of Worldwide, submitted an application for insurance to the National Council on Compensation Insurance ("NCCI"), Administrator of the Iowa Workers' Compensation Insurance Policy. (Dkt. 54 at ¶ 6; Dkt. 54-1, Exhibit 2.) In the application, the ACORD Form 130 ("ACORD 130"), Worldwide[1] requested coverage with a proposed effective date of June 13, 2014 and indicated that it conducts business in Iowa, resides in Iowa, that the mile radius for hauling is 25-50 miles, that Iowa is the "majority driving state," and that Worldwide only seeks coverage in Iowa. (Dkt. 54 at ¶¶ 23, 24, 25.) Worldwide also stated that a list of drivers and drivers' states of residence was "to be determined." (Dkt. 54 at ¶ 24.) Worldwide named Austin Ramirez as the contact person in the form and Ramirez further elected to be excluded from coverage as the "Pres" of Worldwide. (Dkt. 54 ¶¶ 12, 13.) In fact, Worldwide represented that it had zero covered employees and that 100% of its work would be done by subcontractors. (Dkt. 54 at ¶ 46; Dkt. 54-1 at p. 22, Exhibit C.) Confusingly, in response to the question "Do employees travel out of state? If yes, indicate state(s) of travel and frequency[,]" Worldwide responded "Illinois etc long distance hauling."

---

[1] To the extent that the decision refers to either Sheridan or Worldwide when discussing the insurance application, the Court does not make any factual findings about Sheridan's role versus Worldwide's role in the dispute over the Finnegan claim.

(*Id.*) This is the only place in the ACORD 130 that Worldwide mentions business in Illinois and the application otherwise indicates that Worldwide's drivers are local haulers. (*Id.* at 21.) On June 24, 2014, NCCI issued a "Binder," acknowledging Worldwide's application for workers' compensation coverage in Iowa: "Coverage has been requested for the following states: IA[.]" (Dkt. 54 at ¶ 29.)

The NCCI assigned Worldwide to Hartford which, through its administrator, The Travelers Indemnity Company ("Travelers")[2], issued the Hartford policy, covering Worldwide for liabilities under the Iowa Workers Compensation Act ("Iowa WCA"). (Dkt. 54 at ¶ 7.) Part One of the Hartford policy covers bodily injury, requires Hartford to promptly pay benefits required by workers' compensation law, and includes Hartford's right and duty to defend at Hartford's expense any claim, proceeding or suit against Worldwide for benefits payable by the insurance. (Dkt. 54-1 at p. 42, Hartford Policy, Ex. 1G.) Part One further states that Harford does not have a duty to defend a claim, proceeding or suit that is not covered by the insurance. (*Id.* at p. 38.) Part Two of the policy provides that the claimant's bodily injury must arise in the course of employment and that "[t]he employment must be necessary or incidental to [the insured's] work in a state or territory listed in Item 3.A of the Information Page." (*Id.* at 7.) Under Item 3.A, Worldwide only listed Iowa. (*Id.* at 38.). But the parties only dispute whether Worldwide is covered by Part Three, the Residual Market Limited Other States Insurance Endorsement ("LOSI"). Part three of the policy states:

**PART THREE OTHER STATES INSURANCE**
    **A. How This Insurance Applies**
    1. We will pay promptly when due the benefits required of you by the workers compensation law of any state not listed in Item 3.A. of the Information Page if all of the following conditions are met:

---

[2] Hartford contracted with The Travelers Indemnity Company ("Travelers") to issue and service policies assigned to Hartford through the Iowa WCIP. (Ex. 1, ¶ 27 and Ex. 1-F, p. 001; Ex. 3, ¶ 27; Ex. 11, ¶ 3)

> a. The employee claiming benefits was either hired under a contract of employment made in a state listed in Item 3.A. of the Information Page or was, at the time of injury, principally employed in a state listed in Item 3.A. of the Information Page; and
>
> b. The employee claiming benefits is not claiming benefits in a state where, at the time of injury, (i) you have other workers compensation insurance coverage, or (ii) you were, by virtue of the nature of your operations in that state, required by that state's law to have obtained separate workers compensation insurance coverage, or (iii) you are an authorized self-insurer or participant in a self-insured group plan; and
>
> c. The duration of the work being performed by the employee claiming benefits in the state for which that employee is claiming benefits is temporary.

*Id.* at 9.

In the ACORD 130, Worldwide represented that it had no covered employees at all and so the estimated premium for the Hartford policy was only $700. (Dkt. 54 at ¶ 46.) On October 2, 2014, one day after Worldwide and Sheridan learned of the Finnegan claim, Sheridan sent an e-mail to Travelers, asking that the amount of Worldwide's estimated payroll shown on the Hartford policy be increased to "$600,000 local hauling 7228." (Dkt. 54 at ¶ 47.) On October 2, 2014, Travelers endorsed the Hartford policy, reflecting a "Premium Basis-Estimated Total Annual Remuneration" of $600,000 for Class Code 7228, and "Estimated Annual Premium" of $85,100. (Dkt. 54 at ¶ 48.) On October 22, 2014, Travelers issued endorsements reflecting an additional premium of $2,520 and reflecting a change in the Class Code from 7228[3] to 7229, "Long Distance Hauling," and an updated total premium due of $87,620. (Dkt. 57 at ¶ 49.) On October 23, 2014, Sheridan forwarded to Travelers the Federal Tax Returns for Worldwide in the first three quarters of 2014. Based on the returns, Worldwide wanted to again reduce the payroll

---

[3] Hartford provides an exhibit explaining the definition and scope of code 7229, but there is not a definition for 7228, the code Worldwide had previously disclosed in the ACORD 130. (*See* Dkt. 54-2 Exhibit 13-E.)

basis from $600,000 to $250,000.[4] (Dkt. 54-1, Ex. 8, GK 122.) On October 27, 2014, the Hartford policy was endorsed to reflect "Estimated Total Annual Remuneration" of $250,000 and "Estimated Annual Premium" of $36,660. (Dkt. 57 at ¶ 53.) On October 31, 2014, Travelers issued a bill for premium in the amount of $35,960 and Worldwide paid $25,769.50 leaving a balance of $10,190.50. (Dkt. 54 at ¶ 55.) On November 24, 2014, Travelers issued another bill for the premium on the Hartford policy, showing a balance of $10,190.50 and a minimum of $3,396.83 due by December 14, 2014; Travelers received the minimum payment on December 5, 2014. (Dkt. 54 at ¶¶ 56, 57.)

Also in November 2014, Travelers initiated a review of Worldwide's policy because the Finnegan claim had "indicated that he was hired, worked, supervised, and allegedly injured in Illinois," and because shortly after Travelers learned of the claim, "Sheridan submitted requests to significantly increase and then decrease the estimated annual remuneration on the policy." (Dkt. 54 at ¶ 58.)

On December 9, 2014, Travelers sent a letter to Worldwide via First Class U.S. Mail, requesting a detailed list of all vehicles and drivers operating for Worldwide during the policy period to date, including terminal location, the State in which the driver spent the majority of his or her time driving, and the State of each driver's residence and the estimated annual payroll. (Dkt. 54 at ¶ 59.) On December 29, 2014, Travelers sent a "Second Request" to Worldwide by First-Class U.S. Mail, requesting the same information. (*Id*. at ¶ 60.)

On December 30, 2014, Travelers' premium auditor received Worldwide's payroll records for the period of June 13, 2014 through December 31, 2014. (Dkt. 54 at ¶ 61.) Travelers' auditor then compiled a list of Worldwide's employees and sent it to Worldwide by

---

[4] Worldwide's 941 Form for July, August and September, 2014 reflected that Worldwide paid its employees "wages, tips and other compensation" of $170,179.84. (Dkt. 57 at ¶ 52.)

email, requesting additional information on each employee relating to the state in which the drivers worked and resided. (Dkt. 54 at ¶ 62.) On January 5, 2015, Worldwide responded to the auditor with a spreadsheet revealing that, from June 13, 2014 through December 31, 2014, Worldwide employed 32 Illinois residents as drivers, working exclusively in Illinois, 23 individuals as drivers, working exclusively or partially in Iowa, and seven other drivers who worked and lived in Ohio or Minnesota. (Dkt. 54 at ¶ 63.)

On January 7, 2015, Sheridan e-mailed Travelers requesting to add coverage in Illinois, Minnesota, Nebraska, Indiana, Wisconsin, Ohio, and Missouri. (Dkt. 54-2 Exhibit 11-I.) Based on the information provided by Worldwide during the audit in January 2015, Travelers determined that, for the period of June 13, 2014 through December 31, 2014, there was remuneration attributable to "Worldwide employees who presented exposure to the Hartford policy." (Dkt. 54-2 at ¶ 7.) Hartford presumes the remuneration Travelers refers to is Worldwide's lack of a connection to Iowa, but this is never explicitly stated in the declaration Hartford cites to for the proposition. On January 20, 2015, also based on the results of the audit, Hartford estimated a "Premium Basis-Estimated Total Annual Remuneration" of $67,677 and an "Estimated Annual Premium" of $10,290. (Dkt. 54 at ¶ 65.) Because Worldwide had paid a premium, (Worldwide paid Travelers $25,769.50 on October 31, 2014) Travelers issued a refund to Worldwide. (*Id.* at ¶ 66.)

*Finnegan Claim*

Worldwide hired Mr. Finnegan to work as a truck driver on August 10, 2014. (Dkt. 54 at ¶ 70.) During his tenure with Worldwide, Mr. Finnegan worked in Illinois 100% of the time. (Dkt. 54 at ¶ 71.)

On October 1, 2014, Sheridan learned of Mr. Finnegan's injuries, notified Travelers, and Travelers notified Hartford on October 2, 2014. (Dkt. 54 at ¶ 74.) On November 25, 2014, Travelers sent a letter to Worldwide, acknowledging receipt of an "Illinois claim" for Mr. Finnegan against Worldwide, and disclaiming any and all obligations under the policy with respect to the claim. (Dkt. 54 at ¶ 77.) On August 5, 2015 Mrs. Finnegan, as next of kin of Mr. Finnegan, filed an Application for Adjustment of Claim against Worldwide, seeking benefits under the Illinois Workers Compensation Act ("IWCA") for injuries Mr. Finnegan sustained on September 17, 2014, in McCook, Illinois, while working for Worldwide. (Dkt. 57 at ¶ 68.) Case No. 15 WC 23606 ("*Finnegan* Application").

Traveler's Detail Loss Report, detailing losses from June 13, 2014 to April 6, 2015, shows that there was a loss of $2,132.00 in connection with Finnegan's workers' compensation claim. (Dkt. 56-1, Travelers Detail Loss Report at Exhibit A; Dkt. 61-1, Declaration of D. Rudow at Exhibit 3, ¶ 7.) However, according to Hartford, this was not a payment on Finnegan's claim but rather was incurred in connection with an investigation associated with the claim and for charges for review of medical bills submitted to Travelers in connection with the claim. (*Id.* at ¶ 8.)[5]

## LEGAL STANDARD

Summary judgment is proper when the evidence developed through the course of discovery reveals "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). In determining whether a

---

[5] The parties dispute when Worldwide first obtained a copy of the Hartford Policy. Hartford alleges that a copy of the Hartford policy was sent to Worldwide at the time it was issued via First Class U.S. Mail, with proper postage prepaid, at the address shown in Worldwide's application. (Dkt. 57 at ¶ 36.) Worldwide claims it did not receive a copy of the policy until after receiving the Finnegan Application dated August 5, 2015. (*Id.*) But it is unclear how the dispute is material.

genuine issue of material facts exists, this Court construes all facts and draws all reasonable inferences in favor of the non-moving party. *PQ Corp. v. Lexington Ins. Co.*, No. 16-3280, 2017 WL 2772587, at *3 (7th Cir. June 27, 2017). The Court will nonetheless limit its analysis of facts to evidence and that the moving party has properly identified and supported in its Rule 56.1 statements. *Bordelon v. Chi. Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). As the party opposing the motion for summary judgment, Defendants "get[] the benefit of all facts that a reasonable jury might find." *Loudermilk v. Best Pallet Co.*, 636 F.3d 312, 314 (7th Cir. 2011).

## DISCUSSION

A. Choice of Law / Construction

The Hartford policy does not contain a choice-of-law provision but the parties agree that Iowa law should apply. (Dkt. 61 at 4.) Under Iowa's rules governing the construction and interpretation of insurance policies, the cardinal principle is that the intent of the parties at the time the policy was sold must control. *Amish Connection, Inc. v. State Farm Fire & Cas. Co.*, 861 N.W.2d 230, 236 (Iowa 2015). Except in cases of ambiguity, the court determines the intent of the parties by looking at what the policy itself says. *Id.* After construing the policy, the claimant's pleadings, and any other admissible facts, an insurer has no duty to defend if it appears the claim is not covered. *Talen v. Emp'rs. Mut. Cas. Co.*, 703 N.W.2d 395, 406 (Iowa 2005). Where there is no coverage, there is no duty to defend. *Pursell Const., Inc. v. Hawkeye-Sec. Ins. Co.*, 596 N.W.2d 67, 72 (Iowa 1999). Because the duty to defend is broader than the duty to indemnify, if there is no duty to defend, there is no duty to indemnify. *Stine Seed Farm, Inc. v. Farm Bureau Mut. Ins. Co.*, 591 N.W.2d 17, 18 (Iowa 1999).

B. The Hartford Policy

Hartford argues that there is no available coverage for the Finnegan claim under Parts One and Two of the policy. (Dkt. 55 at 10–12.) Worldwide does not dispute that it cannot seek coverage under these parts, but asserts that coverage is appropriate under the LOSI Endorsement. When a party does not respond to an argument it is deemed waived and therefore Worldwide's lack of response is deemed an admission that there is no available coverage under Parts One and Two. *See C & N Corp. v. Kane*, 756 F.3d 1024, 1026 (7th Cir. 2014) (finding that a nonmovant's failure to make an argument in response to a summary judgment motion constituted a waiver of that argument); *see also Bonte v. U.S. Bank, N.A*., 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver."). Therefore, the Court turns to whether the LOSI endorsement provides coverage.

Under the LOSI endorsement, Hartford, "will pay promptly when due the benefits required of [Worldwide] by the workers compensation law of any state not listed in Item 3.A. of the Information Page[,]" and goes on to state the three conditions that must be met to extend coverage:

> a. The employee claiming benefits was either hired under a contract of employment made in a state listed in Item 3.A. of the Information Page or was, at the time of injury, principally employed in a state listed in Item 3.A. of the Information Page; and
>
> b. The employee claiming benefits is not claiming benefits in a state where, at the time of injury, (i) you have other workers compensation insurance coverage, or (ii) you were, by virtue of the nature of your operations in that state, required by that state's law to have obtained separate workers compensation insurance coverage, or (iii) you are an authorized self-insurer or participant in a self-insured group plan; and
>
> c. The duration of the work being performed by the employee

claiming benefits in the state for which that employee is
claiming benefits is temporary.

(Dkt. 54-1, Hartford Policy, Ex. 1G at 9.) Here, Worldwide did not list Illinois and only listed Iowa under 3.A. and, therefore, the Finnegan claim must meet all three conditions of the LOSI endorsement to invoke Hartford's duty to defend. Hartford argues that at least two LOSI requirements are not met. Hartford does not contest whether the first LOSI requirement is met,[6] but contends that the second and third conditions have not been met.

*Second LOSI Condition*

The applicability of the second condition turns on whether, by virtue of the nature of its operations in Illinois, Worldwide was required by Illinois law to have obtained separate workers' compensation insurance coverage. 820 ILCS 305/4(a)(3) (West 2010). Based on the undisputed facts, the Finnegan claim does not meet the condition.

Under Illinois's Workers Compensation Act, in order to ensure the payment of workers' compensation benefits, an employer must either self-insure or:

> Insure his entire liability to pay such compensation in some insurance carrier authorized, licensed, or permitted to do such insurance business in this State. Every policy of an insurance carrier, insuring the payment of compensation under this Act shall cover all the employees and the entire compensation liability of the insured[.]

820 ILCS 305/4(a)(3) (West 2010).

Worldwide argues that it was not required to obtain separate insurance under Section 4(a)(3) of the Act based on the decision in *Cont'l W. Ins. v. Knox Cty.* ("*Continental*"). 2016 IL

---

[6] The first requirement is that "[t]he employee claiming benefits was either hired under a contract of employment made in [Iowa] or was, at the time of injury, principally employed in [Iowa][.]" There is an issue of fact, Hartford concedes for purposes of the motion, as to whether Mr. Finnegan was hired in Illinois. Worldwide claims he was hired in Iowa via telephone and Mrs. Finnegan assert that Mr. Finnegan was hired in Illinois. (Dkt. 55 at 12.) The fact issue, however, is not material because Worldwide must meet all three conditions and fails to meet the other two requirements.

App (1st) 143083. In *Continental*, the Illinois Appellate Court analyzed a LOSI provision[7] similar to the provision in the Hartford policy and expressly held that "Illinois law does not require that . . . [the insured] maintain a 'separate' insurance policy for its liability arising under the Act." *Id*. The insured employer, a provider of ambulance services, had a regular place of business in Indiana but its employees sometimes made trips into Illinois to pick up patients and take them to Indiana for medical treatment. *Id.* at ¶ 3. When one employee was injured while picking up a patient in Illinois, Continental filed a declaratory judgment action seeking a ruling that it had no duty to defend or to pay any benefits due on the Illinois claim. *Id.* at ¶ 3. Like in the Hartford policy, the insured had only mentioned its home state of Indiana in its insurance application. And therefore, based on identical provisions to the Hartford policy, in *Continental* the insured could only obtain coverage outside of Indiana if the Illinois claim met the conditions of the LOSI endorsement, including that the coverage is sufficient to satisfy Illinois's workers' compensation law. *Id.* at at ¶ 5. Because Continental was a carrier authorized and licensed to do business in Illinois, the insured had complied with Illinois's requirements by contracting for the coverage of its entire workers' compensation liability and was not required to have purchased a separate Illinois policy. *Id.* But *Continental* is distinguishable from the instant case in at least two significant ways.

First, unlike the Continental policy, the Hartford policy was *not* sufficient to satisfy Worldwide's obligation to provide coverage in Illinois. While the Continental Insurance Company was authorized and permitted to conduct insurance business in Illinois, Hartford was only authorized to provide insurance Iowa. Specifically, during the calendar year 2014, Hartford was authorized to act as a "Direct Assignment Carrier," and was not a "Servicing Carrier," for

---

[7] The Continental policy did not refer to its "other states insurance endorsement" as a "LOSI" provision, but the terms represent the same endorsement the same and used interchangeably for purposes of this decision.

the State of Iowa WCIP, and during the same period, was not authorized to act as either in the State of Illinois. (Ex. 19, ¶¶ 4-6 and Ex. 19-A). The NCCI insurance records further establish that the Hartford policy was not certified as proof of coverage in Illinois, but was certified in Iowa. (Dkt. 54, NCCI's Proof of Coverage Records at Exhibit 7-b.) There was no dispute in *Continental* that the insurance company was authorized in Illinois and therefore sufficiently insured under the IWCA. Here, there is no dispute that Hartford was *not* authorized in Illinois and therefore Worldwide had not satisfied its obligation to cover employees like Mr. Finnegan in Illinois.

Second, *Continental* is further distinguishable in comparing the insureds' businesses. Worldwide employed Mr. Finnegan who was not a citizen of Iowa and did not work from a location in Iowa—it is undisputed that 100% of Mr. Finnegan's work was in Illinois. (Dkt. 57 at ¶ 71.) In contrast, in *Continental*, the employee resided in Indiana and went to Illinois only occasionally to pick up patients and return them to Indiana. Moreover, *Continental* addressed coverage for a single employee who was injured in Illinois. Despite Worldwide's knowledge that the Hartford coverage was explicitly limited to Iowa[8], the majority of Worldwide's employees lived and worked out-of-state. From June 13, 2014 through December 31, 2014, Worldwide employed 32 Illinois citizens as truckers, working exclusively in Illinois, 23 Iowa citizens working exclusively or partially in Iowa and seven other drivers who worked or lived in Ohio or Minnesota. (Dkt. 57 at ¶ 63.) Thirty-two Illinois employees should have alerted Worldwide that its Iowa insurance policy was problematic, whereas in *Continental*, an Indiana employer only sought coverage for an Indiana employee. Compounding this, Worldwide also delayed in disclosing to Hartford where its employees worked and resided. When Worldwide hired Mr.

---

[8] For example, the NCCI binder included the insured's acknowledgement that coverage extended only to Iowa. (Dkt. 54 at ¶ 29.)

12

Finnegan to work as a truck driver on August 10, 2014, Worldwide still had not updated the information from the ACORD 130, including that Worldwide had zero employees and that 100% of the Worldwide's work was done by sub-contractors. (Dkt. 54 at ¶ 70; Dkt. 54-1 at 22.) It was not until October 2, 2014, the day after learning of Finnegan's injury, that Worldwide requested that its payroll be increased to accurately cover all of its employees. (Dkt. 54 at ¶ 47.) *Continental* is clearly distinguishable in that it had an authorized carrier for injuries in Illinois. But here, given the location of the work and the Illinois residences of many of its employees, Worldwide needed some further form of coverage to comply with the IWCA.

For those reasons, the second LOSI provision does not apply. But even if the second provision did apply, Worldwide must meet all three conditions and additionally fails to meet the third provision.

*Third LOSI Condition*

The third condition Worldwide must meet to receive coverage under the LOSI provision is that the "duration" of Mr. Finnegan's work in Illinois must have been "temporary." (Dkt. 54-1, Hartford Policy, Ex. 1G at 9.) It is undisputed that Mr. Finnegan was an Illinois citizen who performed 100% of his work for Worldwide in Illinois. Worldwide counters that Finnegan was a new employee and that he died only two months after he began his work with Worldwide and that "[t]here is no evidence to suggest that Finnegan would be exclusively working out of the Illinois terminal[.]" (Dkt. 56 at 10–11.) Worlwide seems to suggest that because Finnegan may have eventually worked outside of Illinois, that therefore the duration of his work in Illinois was temporary. Even if Finnegan's work eventually took him outside Illinois, that does not render his work in Illinois "temporary." Given that all of Mr. Finnegan's work was performed in

13

Illinois and that there is no evidence to suggest that there was anything temporary about that, Worldwide fails to meet the third condition of the LOSI endorsement.

In response to summary judgment, Worldwide also points out that it mentioned Illinois in the ACORD 130. When asked, "[d]o employees travel out of state? [,]" Worldwide indicated "[y]es" and further wrote beneath the question, "ILLINOIS ETC LONG DISTANCE HAULING." (Dkt. 54-1 at p. 22, Exhibit C.) But this one mention of Illinois does not change the analysis, especially because it contradicts the rest of Worldwide's application. For example, Worldwide initially classified itself in the same application as a "local hauler" and only after the Finnegan claim changed its status to a long-hauling company. (Dkt. 54 at ¶ 47.) Worldwide also had represented that the trucking radius was 25-50 miles and that Iowa was the majority driving state. (Dkt. 54 at ¶ 47.) Even more telling is that Worldwide waited to update the policy until months after hiring Mr. Finnegan who did 100% of his work in Illinois. Finally, this mention of Illinois does not change the fact that Hartford was not authorized to provide insurance in Illinois.

Finally, Worldwide raises a dispute in response to Hartford's Motion and claims that it first communicated to Sheridan that Worldwide was doing business in Illinois in May 2014, prior to executing the policy. (Dkt. 54-2 at p. 24, Ex. 10.) But the dispute is not material to whether Hartford had a duty to defend and instead goes to the dispute between Worldwide and third-party defendant Sheridan.

In summary, the Hartford LOSI provision does not extend coverage to the Finnegan claim. As to the second LOSI condition, Hartford was not an insurance carrier authorized or licensed in Illinois and therefore Worldwide needed separate coverage for Illinois in order to its obligations under the IWCA. In order to meet the third LOSI provision, Mr. Finnegan's work in Illinois must have been "temporary" but, in fact, it is undisputed that 100% of his work was done

in Illinois. For those reasons, Worldwide cannot obtain coverage under the LOSI provision of the Hartford policy. Because no other part of the policy applies, coverage is not available for the Finnegan claim.

C. Estoppel and Waiver

Hartford moves for summary judgment on Worldwide's affirmative defenses because (1) there is "no reasonable argument that Hartford waived rights or defenses under its policy, or is estopped" and (2) the doctrines of waiver or estoppel cannot be invoked to create a liability for benefits not contracted for at all. (Dkt. 55 at 14–16.)

In Iowa, a waiver is the "voluntary or intentional relinquishment of a known right." *Scheetz v. IMT Ins. Co. (Mut.)*, 324 N.W.2d 302, 304 (Iowa 1982) (quoting *Travelers Indemnity Co. v. Fields*, 317 N.W.2d 176, 186 (Iowa 1982)). Waiver can be shown by the affirmative acts of a party, or can be inferred from conduct that supports the conclusion waiver was intended. *Id.* (citing *Cont'l Casualty Co. v. G. R. Kinney Co.*, 140 N.W.2d 129, 130 (1966)). While a waiver is the voluntary relinquishment of a known right, estoppel "consists of a preclusion which in law prevents a party from alleging or denying a fact in consequence of his own previous act, averment, or denial. Hence, if a party relinquishes a known right, awarded to him by contract, he cannot without consent of his adversary, reclaim it." *Id.* (citing *Gilbert v. Globe & Rutgers Fire Ins. Co. of New York*, 91 Or. 59, 67 (1919)). Worldwide suggests that Hartford's conduct amounts to a waiver / estoppel in two ways: (1) Hartford did not request an audit until December 2014; and (2) Hartford knew that Finnegan was working and injured in Illinois and paid Finnegan's initial workers' compensation claim of $2,132.00 before it returned any portion of Hartford's premium.

As to the first fact, there is no dispute that Hartford first requested an audit in December 2014. But Worldwide provides no support for the proposition that an insurance company's failure to perform an audit within a given time provides the grounds for an affirmative defense. Moreover, Worldwide represented itself as an Iowa company with Iowa business. And at the same time, by the end of 2014 and despite multiple requests, Worldwide still had not informed Hartford that many of its employees resided and worked out of state. (Dkt. 54 at ¶ 60.). Now Worldwide's position is that Hartford should have audited sooner to find out that Worldwide's representations were inaccurate. To apply waiver or estoppel would wrongly punish Hartford for Worldwide's conduct. Instead, an insurance company should be able to rely on the representations made by employers in applying for insurance. *See, e.g., Rubes v. Mega Life & Health Ins. Co., Inc.,* 642 N.W.2d 263 (Iowa 2002) (court permitted insurance company to rescind coverage when insurer had made misrepresentations in his application for insurance); *see also* Dkt. 54-1, ACORD 130 at Exhibit 1-C ("the applicant represents that reasonable inquiry has been made to obtain the answers to questions on this application. He/she represents that the answers are true[.]"). To punish Hartford under these facts would impose a greater duty on insurance companies to investigate companies prior to effectuating policies—yet another cost that would be inevitably passed along to the consumer. The insured is in a far better position to accurately disclose the details of its own operations. Therefore, Hartford's December audit, or alleged failure to audit sooner, does not constitute a waiver or provide the basis for Worlwide's defense of estoppel.

Next, Worldwide asserts that Hartford accepted the premium and paid the Finnegan claim and so Worldwide reasonably believed the policy covered its employees. (Dkt. 56 at 8–9.) Worldwide's evidence that Hartford paid the Finnegan claim is the Traveler's Detail Loss Report

detailing losses from June 13, 2014 to April 6, 2015 and showing that there was $2,132.00 loss in connection with Finnegan's workers compensation claim. (Dkt. 56-1, Travelers Detail Loss Report at Exhibit A.) Worldwide assumes that the loss was a direct payment on the Finnegan claim. However, in the declaration of Diane Rudow, an employee of Travelers, Rudow explains that Travelers' records reflect that the cost was incurred in connection with an investigation associated with the claim and for charges for review of medical bills submitted to Travelers in connection with the claim. (Dkt. 61-1, Declaration of D. Rudow at Exhibit 3, ¶¶ 7–8.) Travelers' records further reflect that, as of May 16, 2017, Travelers has never made any payments to any person or entity for Mr. Finnegan's medical treatment and never made any payments to the Finnegans for the injury sustained on September 26, 2014.

Even if Hartford had paid the Finnegan claim, the Iowa Supreme Court case that Worldwide relies on does not suggest that the payment on the claim would support estoppel or waiver. In *Briney*, an adjuster was sent to investigate a loss due to a fire about a month before the fire that gave rise to the coverage dispute. *Briney v. Tri-State Mut. Grain Dealers Fire Ins. Co.,* 117 N.W.2d 889, 895 (Iowa 1962). The insured argued that by not cancelling the policy, by retaining the premium and paying the first loss, the insurance company led the plaintiff to believe he had coverage on the premises despite the extra hazard then existing. But there was no similar "first loss" here that Worldwide could have relied on in believing Hartford would cover the Finnegan claim. If Hartford had paid out the claim of another employee who resided and was injured outside of Iowa prior to the Finnegan claim, then the situation would be similar to *Briney*. Instead, the Finnegan claim was the first-time Hartford learned of Worldwide's Illinois activities. Once Worldwide investigated the claim it disclaimed any and all obligations under the policy with respect to the claim. (Dkt. 54 at ¶ 77.)

Worldwide hired an Illinois resident for Illinois work in August 2014 but it was not until January 7, 2015 that Worldwide first requested to Travelers to add coverage in Illinois. (Dkt. 54-2 Exhibit 11-I.) For a company with mostly out-of-state operations, Worldwide took a risk by only applying for coverage in Iowa and none of Hartford's conduct suggested that Worldwide would be protected in taking that risk. Therefore, Hartford's Motion for Summary Judgment on the affirmative defenses is granted.

## CONCLUSION

For those reasons, Hartford's Motion for Summary Judgment [53] is granted.

_____
Hon. Virginia M. Kendall
United States District Judge

Date: March 16, 2018